UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| OAKLEY ENGESSER,<br><br>                    Plaintiff,<br><br>        vs.<br><br>TROOPER EDWARD FOX, OF THE<br>SOUTH DAKOTA HIGHWAY PATROL,<br>IN HIS INDIVIDUAL CAPACITY;<br>MICHAEL KAYRAS, TROOPER FOX'S<br>SUPERVISOR, IN HIS INDIVIDUAL<br>CAPACITY; JENNIFER UTTER, MEADE<br>COUNTY STATES ATTORNEY;<br>GORDON SWANSON, MEADE<br>COUNTY STATES ATTORNEY; AMBER<br>RICHEY, MEADE COUNTY ASSISTANT<br>STATES ATTORNEY; and MEADE<br>COUNTY,[1]<br><br>                    Defendants. | 5:15-CV-05044-JLV<br><br><br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is before the court on plaintiff Oakley Engesser's amended

complaint alleging federal civil rights claims pursuant to 42 U.S.C. § 1983.  See

Docket No. 15.  Now pending are motions for summary judgment by defendant

---

[1] The caption has been modified to reflect the district court's ruling on various motions to dismiss.  See Docket No. 38.  The state of South Dakota was originally a defendant, but is no longer a party so it has been removed from the caption.  Defendants Fox and Kayras are sued only in their individual capacities under plaintiff's federal claims, which are the only surviving claims because the district court dismissed all of plaintiff's state law claims.  Id.  The caption reflects this too.

Michael Kayras[2] of the South Dakota Highway Patrol [Docket No. 57];

defendant Edward Fox, a South Dakota Highway Patrol Trooper [Docket No.

73]; and the Meade County defendants [Docket No. 77]. The district court, the

Honorable Jeffrey L. Viken, Chief United States District Judge, referred these

three motions to this magistrate judge for a recommended disposition. See

Docket No. 107.

## FACTS

### A.    Mr. Engesser's Claims as Determined by the District Court

Following 12 years' incarceration in South Dakota state prison,

Mr. Engesser filed this complaint for damages after successfully obtaining

habeas relief. Mr. Engesser's prison sentence was imposed following a

conviction on one count of vehicular homicide and two counts of vehicular

battery arising out of a July 30, 2000, motor vehicle collision in which the red

Chevrolet Corvette Mr. Engesser was traveling in collided with a white Dodge

Caravan minivan on Interstate 90 west of Sturgis, South Dakota. Dorothy

Finley, the other occupant of the Corvette, was killed in the accident. The

Corvette was estimated to have been traveling at 112 miles per hour when it

struck the van. Both Mr. Engesser and Dorothy had been drinking alcoholic

beverages prior to the crash and neither was wearing a seatbelt.

At Mr. Engesser's 2001 criminal trial, the only issue was whether

Mr. Engesser or Dorothy was driving the Corvette at the time of the accident.

---

[2] Michael Kayras is referred to herein as Mr. Kayras which is how his lawyers
refer to him in pleadings before this court. At the time of the accident,
Mr. Kayras was a sergeant for the South Dakota Highway Patrol.

No witness at trial except defendant Trooper Edward Fox identified the driver of the Corvette at the time of the accident. Granting habeas relief in 2014, the South Dakota Supreme Court held in light of newly discovered evidence presented by Mr. Engesser that "no reasonable juror would have found him guilty of the underlying offense." Engesser v. Young, 856 N.W.2d 471, 484 (S.D. 2014).

In his action for damages herein, Mr. Engesser originally asserted numerous state and federal claims. See Docket No. 15. Following a round of motions to dismiss by the defendants which were partially granted, the following claims remain for decision:

1. a substantive due process claim under § 1983 against Trooper Fox and Mr. Kayras for reckless investigation and manufactured evidence.

2. a procedural due process claim under § 1983 against Trooper Fox and Mr. Kayras pursuant to Brady v. Maryland[3] for destroying the Corvette's sun visor, including any evidence contained on it, and for destroying a video of the scene of the crash.

3. a Monell[4] claim against Meade County for unconstitutional policies and practices.

4. a § 1983 claim for failure to supervise against Mr. Kayras.

5. a § 1983 conspiracy claim against Trooper Fox, Mr. Kayras and the Meade County defendants.

See Docket No. 38 at pp. 37-38. The remaining defendants now move for summary judgment in their favor on these remaining claims.

---

[3] Brady v. Maryland, 373 U.S. 83 (1963).
[4] Monell v. Dept. of Social Serv. of City of NY, 436 U.S. 658 (1978).

**B.    Procedural History**

The procedural history of Mr. Engesser's quest for postconviction relief is chronicled in the South Dakota Supreme Court's opinion granting him habeas relief.  Engesser, 856 N.W.2d at 473-78.  Following his trial, Mr. Engesser filed a direct appeal, decided adversely to him in 2003.  Id.

Thereafter, Mr. Engesser filed his first state habeas petition in 2003, alleging ineffective assistance of his trial counsel.  Id.  That petition was denied at the circuit court and Supreme Court levels.  Id.

He then sought federal habeas relief in this court in 2004 under 28 U.S.C. § 2254.  Id. (see Engesser v. Dooley, 5:04-cv-05065-KES).  Relief was denied at both the district court and Eighth Circuit.  Id. (see Engesser, 5:04-cv-05065-KES at Docket No. 25; Engesser v. Dooley, 457 F.3d 731 (8th Cir. 2006)).  A petition for certiorari to the United States Supreme Court was denied in 2007 on this appeal.  Id.

In 2006, Mr. Engesser filed a second state habeas petition again arguing ineffective assistance of counsel—this time against both trial counsel and his first state habeas counsel.  Id.  The circuit court granted habeas relief, ordering a new trial.  Id.  After the circuit court had held its habeas hearing on that petition, the State disclosed two additional witnesses to Mr. Engesser.  Id.  The circuit court declined to reopen the habeas hearing to take testimony from these two witnesses.  Id.  The

state appealed to the South Dakota Supreme Court, which reversed the grant of habeas relief.  Id.

Mr. Engesser then filed a third state court habeas petition, which was denied.  Id.  Mr. Engesser then filed a second federal habeas petition in 2010.  Id. (see Engesser v. Dooley, 5:10-cv-05039-KES).  An evidentiary hearing was held on June 30, 2011, and thereafter the district court granted habeas relief on the grounds of ineffective assistance of both trial counsel and counsel on Mr. Engesser's first state habeas petition.  Id. (see Engesser, 5:10-cv-05039-KES at Docket No. 77).  The Eighth Circuit reversed and denied habeas relief.  Id. (see Engesser v. Dooley, 686 F.3d 928, 937 (8th Cir. 2012)).

In 2013, Mr. Engesser filed his fourth and final state habeas petition in circuit court.  Id.  That petition was granted.  On appeal, the South Dakota Supreme Court affirmed finding in light of newly discovered evidence presented by Mr. Engesser that no reasonable juror would have found him guilty of the underlying offense.  Id. at 484.

At Mr. Engesser's criminal trial, the only witness to testify as to who was driving the Corvette at the time of the collision was defendant Trooper Edward Fox, who testified Mr. Engesser was the driver.  Since that 2001 trial, these six other witnesses' testimony have been added to the cumulative evidentiary record, all of whom testified a woman was driving the Corvette:  Eric Eckholm and Charlotte Delaney Fowler (added after the first state and federal habeas); Greg Smeenk (added after the

5

second state habeas); Sean Boyle and Philip Syverson (added at the third

state habeas); and Ramona Dasalla (added at the fourth state habeas).

## C.    Undisputed Material Facts

The following facts are taken from statements of material fact

posited in support of each of the three summary judgment motions and

either admitted to, wholly or qualifiedly, by Mr. Engesser.  Key to

analyzing the legal liability of defendants in this case is not only what

hindsight later revealed the true facts to be, but what was known by

defendants at the time.  Therefore, the court sets forth the true facts as

now known, but indicates where appropriate if the fact recited was not

learned by defendants until later.

In the early evening of July 30, 2000, Oakley Engesser and

Dorothy Finley were at the Full Throttle Saloon, near Sturgis, South

Dakota.  Docket No. 87, SMF 1.  After both had been drinking alcoholic

beverages, they left the saloon together at approximately 6:30 to 7 p.m.,

traveling in Dorothy's red Corvette.

The court takes judicial notice that July 30, 2000, was the Sunday

before the Monday start to the Sturgis Motorcycle Rally, an event that

draws hundreds of thousands of visitors to the Sturgis, South Dakota,

area each year.  Visitors begin arriving the weekend before the Rally

begins and generally leave by the end of the Sunday following, so that the

Rally really extends for 9 days.  In the year 2000, the South Dakota

Department of Transportation estimates 604,441 motor vehicles

descended on Sturgis during the Rally.  See https://Sturgis.com/content/rallyinfo/past-attendance-info.html, last checked January 23, 2019.

At approximately 8 p.m. on July 30, 2000, Dorothy's red Corvette, traveling east on Interstate 90 at an estimated 112 miles per hour,[5] collided with the rear of a white Dodge Caravan minivan and spun out of control.  This happened at approximately mile marker 39 on I-90.  The Corvette left the interstate and rolled, landing on its roof in the center median.

Mr. Engesser was ejected from the Corvette during the crash and landed face down in the median approximately 5 to 15 feet from the driver's side door of the car.  Dorothy was trapped inside the Corvette on the passenger side with her upper body on top of the seat and her feet underneath the dash on the passenger side.  The sun roof and windshield of the Corvette were intact, but the passenger-side door window was smashed completely out.

Greg Smeenk, a civilian, was among the first to arrive at the accident scene even before emergency responders.  He approached the Corvette and saw Dorothy inside.  The passenger side of the Corvette was crushed with the passenger window completely gone.  Smeenk knew he could not open the passenger door to get to Dorothy, so he approached

---

[5] Mr. Engesser both denies as irrelevant, then later admits, the speed of the Corvette at the time of the accident.  See Docket No. 87 at p. 6, ¶ 33, and at p.10, ¶ 56; p. 24 at ¶ 146.

the driver's side of the car and opened the driver's door, which up to that point had remained closed. He determined Dorothy was deceased.

Mary Redfield, also a civilian and a nurse, had approached Mr. Engesser and was checking on him. A third person yelled at Smeenk to get away from the Corvette because it might blow up. Smeenk left the accident scene before law enforcement or emergency personnel arrived. He did not make a statement to any officer at the scene the day of the accident and he never contacted law enforcement after the fact to report his actions or observations. Smeenk's role in these events first became known when he contacted law enforcement in 2007 and then testified in Mr. Engesser's 2011 habeas action. Mary Redfield testified at the grand jury proceedings involving Mr. Engesser's criminal charges. She testified to observing the driver's door of the Corvette open, but she never testified that she saw Greg Smeenk or anyone else open that door.

Emergency personnel arrived on the scene in several vehicles. The first paramedic to observe Dorothy in the Corvette, Aaron Zimmiond, initially thought Dorothy was pinned in on the driver's side of the Corvette and told Trooper Fox this. Later, Zimmiond realized Dorothy was really on the passenger's side and that he had been confused by the orientation of the Corvette resting upside down on its roof. Zimmiond corrected his statement with Trooper Fox during a September 14, 2000, interview.

Zimmiond determined Dorothy had died, and he and others
removed her body from the Corvette. They likewise began administering
emergency aid to Mr. Engesser and removed him to a hospital.
Mr. Engesser sustained injuries to both sides of his body in the accident.
Dorothy died as a result of injuries sustained to the right side of her body
and head.[6]

Trooper Fox of the South Dakota Highway Patrol arrived on the
scene at approximately 8:18 p.m. By this point, approximately 10-20
minutes after the accident, there were "a lot" of vehicles parked on the
side of the road. See Docket No. 109 at p. 15 (p. 57-58 of Fox
deposition). He found Dorothy had been removed from the car, laid in
the grass and covered with a cloth. He found Mr. Engesser had been
removed and was being transported to a hospital. And Smeenk had
opened the driver's side door of the Corvette and departed, unbeknownst
to any of the officers.

Defendant Sergeant Mike Kayras, Trooper Fox's supervisor, also
arrived on scene and placed Trooper Fox in charge of the investigation.
At this point, Trooper Fox had a two-year associate's degree, had served
four years in the United States Air Force in a law enforcement capacity,
and had served two and a half years with the South Dakota Highway

---

[6] Mr. Engesser objects to this fact as "irrelevant and not a material fact," but
does not otherwise object to the facts asserted. The court finds the totality of
facts available to the defendants regarding the accident are relevant.

Patrol.  He had been given accident investigation training at the South Dakota law enforcement academy and he had investigated approximately 100-150 accidents prior to the Engesser accident.[7]  At the academy he had also received training in witness interviewing and evidence preservation.  Trooper Fox's personnel file with the Highway Patrol contained no indication of any negative conduct by Fox, including no suggestion he would fabricate evidence, destroy evidence, or lie about material facts of a case.  Mr. Kayras was aware of Trooper Fox's training and experience at the time he put him in charge of the investigation.

Mr. Kayras instructed Trooper Fox to take all witness statements.  Mr. Kayras instructed other law enforcement officers at the scene to direct any witness with relevant evidence to Trooper Fox.  As to passers-by who were gawking at the accident creating a traffic jam and who did not have any relevant knowledge, Mr. Kayras told officers they were to send such people on their way.  Other officers at the scene included South Dakota Highway Patrol Troopers Darrin Hanzlik and Greg Dirk, and Meade County Sheriff's Deputy Mike Walker.  There were also one or more unspecified Sturgis Police Department officers on scene.

---

[7] Mr. Engesser objects to these facts as irrelevant when asserted by Trooper Fox, but does not otherwise contradict them. Mr. Engesser actually *admits* these facts when asserted by Mr. Kayras.  In any event, one of Mr. Engesser's claims against Mr. Kayras is that he is liable for placing Fox in charge of the investigation when Kayras should have known Fox had insufficient expertise and experience to be in charge of a fatality accident.  The court finds the facts regarding Fox's experience and education to be relevant to this claim.

Trooper Fox spoke to these witnesses at the scene:  Eric Eckholm, Charlotte Delany Fowler[8] (who was with Mr. Eckholm), Daniel Huss, Beau Goodman, and Mary Redfield.  Trooper Fox did not video or audio record any of these statements.  There were six patrol vehicles at the scene equipped with video and audio recording capabilities.  It was standard policy to record statements, according to Mr. Engesser.

According to later testimony given by Eckholm and Delaney Fowler, Trooper Fox never asked them specifically who was driving. Eckholm testified later in habeas proceedings that he continually used female pronouns such as "she," "her" and "the woman" to refer to the driver of the Corvette when he gave his oral statement to Trooper Fox.

Delaney Fowler told Trooper Fox at the accident scene that she had not observed the accident.  By his own admission, Trooper Fox never asked any witness if the door to the Corvette had opened upon impact or whether any bystander or other person had opened the door after the accident.

After Eckholm gave his statement orally to Trooper Fox, Trooper Fox asked Eckholm to write out his statement on paper.  Eckholm did so, but never stated in his written statement that a woman had been

_____

[8] Charlotte was Charlotte Delaney at the time of the accident, but is now known as Charlotte Fowler.  Because some of the parties refer to her as "Delaney" and others as "Fowler," the court finds it clearest to refer to her as "Delaney Fowler" so that there is no question who is being referenced in this opinion.

driving the Corvette just prior to the accident.  See Docket No. 76-5. Ms. Redfield, Mr. Huss, and Mr. Goodman all also provided written statements.[9]

Delaney Fowler did not provide a written statement because she represented she had not seen the accident.  Seven years later, in 2007 at one of Mr. Engesser's habeas hearings, she testified she had told Trooper Fox on scene she saw a woman driving the Corvette.  Trooper Fox contacted Delaney Fowler by telephone on September 12, 2000 (see Docket No. 76-8 at p. 3 detailing content of phone contact).  Delaney Fowler testified at Mr. Engesser's 2007 habeas hearing that Trooper Fox never contacted her again after the date of the accident.  However, in 2011, Delaney Fowler testified Trooper Fox did contact her by telephone following the accident, but she could not remember the content of their conversation.

After interviewing witnesses on scene, Trooper Fox reported to Sgt. Kayras that no witness had seen who was driving.  Trooper Fox examined the interior of the Corvette in the dark on the night of the accident with the aid of a flashlight.  He did not observe any blood on the passenger door.

Trooper Fox interviewed Mr. Engesser twice following the accident, once at the hospital and a second time at a gas station in Sturgis in his

---

[9] None of these statements identified the driver of the Corvette.  See Docket Nos. 76-3, 76-4, 76-5, 76-6.

patrol vehicle.  The latter statement was audio recorded on a video tape with the video portion of the tape showing only that area in front of Trooper Fox's patrol car.  Mr. Engesser stated he did not remember anything after leaving the Full Throttle Saloon on the day of the accident. He told Trooper Fox that Dorothy had been driving when they left the saloon.  Although he admitted it was possible he could have switched places with Dorothy prior to the accident, he asserted four separate times that he was not driving.  Mr. Engesser did admit that Dorothy had allowed him to drive the Corvette earlier in the day (presumably before the visit to the saloon).

Trooper Fox interviewed the driver of the white Dodge minivan following the accident.  That driver never saw the vehicle that hit his van and so was unable to state who had been driving.

Following the accident, Trooper Fox wrote three reports in which he concluded Dorothy had been driving the Corvette.  Some of these early reports were based, in part, on the erroneous statement from Aaron Zimmiond, the emergency responder who at first believed Dorothy was found in the driver's side of the Corvette.  Another emergency responder who Trooper Fox interviewed on September 12, 2000, confirmed that Dorothy's body was found on the passenger side of the Corvette.  On September 14, 2000, Zimmiond corrected his statement and confirmed he found Dorothy pinned in on the passenger side.

In his fourth report dated September 14, 2000, Trooper Fox changed his conclusion and accused Mr. Engesser of being the driver. Mr. Kayras reviewed and signed off on each of Trooper Fox's four reports. Mr. Kayras testified the full extent of his review of Fox's reports was to make sure spelling and grammar were correct and that Fox had used the correct code numbers in the code boxes on the report.

After the on-scene investigation, Trooper Fox arranged to have the Corvette towed to Sherer's Auto, a local private impound yard and stored the car there in a lot that was secure from public access.  The Corvette was not parked inside, tarped, or otherwise protected from the elements. The passenger window was completely gone.  It is not known if the driver's side door was closed during storage.  There is no evidence in this court's record that Trooper Fox or any other law enforcement officer instructed the proprietors of the impound yard that they were not to allow anyone to access the vehicle.

Becky Feist, Dorothy's daughter, went to the impound yard with some other relatives the day after the accident and asked if she could retrieve her mother's belongings from the Corvette.  Feist had a financial interest in asserting that Mr. Engesser was the driver of the Corvette because, if that were the case, Feist stood to receive $100,000 in motor vehicle accident proceeds.

After Feist and her companions were allowed to root around inside the Corvette, Feist retrieved Dorothy's purse.  Feist maintained she had

14

retrieved the purse from under the passenger side dash.  At
Mr. Engesser's trial, Feist testified her mother normally traveled with her
purse at her feet when she was a passenger in a vehicle.  Neither Trooper
Fox nor Sgt. Kayras knew about in advance, or gave permission, for Feist
to have access to the Corvette while it was in storage.

One month after the accident, on August 23, 2000, the state's
blood and fibers expert, Rex Riis, examined the Corvette in the impound
lot.  Riis removed the sun visor from the passenger side and took it back
to the lab in Pierre, South Dakota, for potential testing.  He discovered a
grey hair fragment on the visor.  However, Riis never did test the hair
because it lacked a follicle.  Riis mailed the sun visor back to the South
Dakota Highway Patrol via Federal Express on May 9, 2001.  The
Highway Patrol office in Rapid City, South Dakota, received the sun visor
on May 10, 2001.  Sometime thereafter, the state lost the sun visor.[10]  Its
whereabouts are unknown today.

Riis observed blood on the sun roof of the vehicle above the
passenger seat, but did not test it.  He felt the forensic value was low
because the blood was where Dorothy's head would have been after the
vehicle came to rest.  Because the car and the passengers in it rolled

---

[10] The defendants assert they misplaced the visor sometime after the trial.
They maintain it was available for both sides to use during the trial, but
neither side called for the visor to be introduced into evidence.  The visor was
only discovered to be missing during habeas proceedings in 2010.  The truth is
that no one can say with any certainty when the visor was lost other than it
was lost sometime after May 10, 2001.

several times, Riis testified at trial the occupants would have bounded to and fro in the vehicle and, therefore, the location of any blood would not have tended to prove the occupant sat in a particular location in the car pre-accident.

Riis did not observe any blood on the passenger side of the vehicle, admittedly after the vehicle had been exposed to rain, hail, and wind for a month. Riis admitted at trial any blood spatters that may have existed could have been washed away by the elements.

On October 19, 2000, long prior to criminal proceedings being instituted against Mr. Engesser, a lawyer representing Mr. Engesser in a civil matter arising out of the accident sent a letter to defendant then-Meade County State's Attorney Jennifer Utter. In the letter, the lawyer advised Ms. Utter that Sean Boyle had information that Dorothy had been driving the Corvette when she and Mr. Engesser left the saloon. The lawyer stated he had personally spoken to Mr. Boyle and that Boyle told him Dorothy was reluctant to let anyone drive her car. Mr. Boyle stated that even though he knew Dorothy fairly well, she had never let him drive her Corvette nor had she ever offered to let him drive it.

Ms. Utter faxed the letter to Trooper Fox and requested Fox to follow up on the lead. Ms. Utter responded to the lawyer in writing, saying "I will follow-up with Mr. Boyle." Trooper Fox has no document indicating he ever attempted to follow-up with Mr. Boyle and obtain his statement. There was an arrest warrant out for Mr. Boyle at the time.

16

Trooper Fox testified efforts were made to locate Boyle, but those efforts were unsuccessful and undocumented.

On October 16, 2000, a lawyer representing Dorothy's estate also sent a letter to the Highway Patrol requesting any information they might have on the accident. Mr. Kayras hand wrote across the letter— "Criminal charges pending don't release information." Later, the Highway Patrol received a subpoena *duces tecum* from Mr. Engesser's civil attorney requesting copies of the accident investigative file.

The state decided to pursue an indictment against Mr. Engesser. Trooper Fox testified before the grand jury in order to obtain that indictment. The grand jury issued an indictment on February 14, 2001, charging Mr. Engesser with vehicular homicide.

Located in Trooper Fox's file were names and/or written statements of these witnesses: Beau Goodman, Eric Eckholm, Charlotte Delaney Fowler, and the lawyer's letter as to Sean Boyle. All of these materials were provided to defendant then-Meade County State's Attorney Gordon Swanson who, in turn, provided copies to Mr. Engesser's criminal trial attorney, Timothy Rensch prior to trial. Both Eckholm and Delaney Fowler were listed as witnesses in this material and the state listed Eckholm as a potential trial witness in the state's filings with the court. The state did not call Eckholm to testify at trial. Mr. Rensch also did not call Eckholm as a witness at trial.

17

Mr. Rensch also did not request testing of the sun visor or the interior of the Corvette prior to trial.

Prior to trial, Trooper Fox was unaware that Greg Smeenk, Philip Syverson, and Ramona Dasalla were witnesses with relevant information about the accident.

During the pretrial phase of the criminal case, Mr. Engesser's trial counsel, Mr. Rensch, sent blank video and audio cassette tapes to defendant Swanson, requesting copies of any recorded discovery. Four days later, Swanson wrote back to Mr. Rensch that "one of the troopers took a videotape at the scene, which we'll copy if you send us a blank cassette." On April 5, 2001, defendant then-Deputy Meade County State's Attorney Amber Richey wrote to Mr. Rensch providing Mr. Rensch with Trooper Fox's video recording of his gas station interview with Mr. Engesser.

Defendants assert the video of Trooper Fox's September, 2000, interview with Mr. Engesser is the only video evidence the state had regarding this investigation. Although Mr. Engesser denies this assertion, Mr. Engesser provides no proper evidence under Federal Rule of Civil Procedure 56 to contravene the fact. All Mr. Engesser offers in support of his denial is the assertion that six patrol vehicles were present at the accident scene and that the Highway Patrol could have used their dash video cameras to create video at the time of the investigation.

18

Mr. Engesser offers no support for the suggestion that defendants actually used their video capabilities to create a video.

Mr. Engesser availed himself of his right to a jury trial.  The sole issue at trial was whether he or Dorothy had been driving the Corvette at the time of the accident.  Trooper Fox is the only witness who testified at trial that Mr. Engesser was driving the Corvette at the time of the crash. No testimony from any witness placed Dorothy in the driver's seat. Mr. Engesser did not testify.  He was convicted at the conclusion of the trial.  Mr. Engesser was sentenced to 25 years in the state penitentiary.

Following his conviction, Mr. Engesser pursued a direct appeal as well as several habeas actions in state and federal courts.  Evidentiary hearings on habeas petitions were held in 2007, 2011, and 2013.

In July, 2007, Eckholm and Delaney Fowler testified at a habeas hearing.  Eckholm testified he had seen news regarding Mr. Engesser's trial back in 2001 and that he had contacted Mr. Rensch.  Eckholm testified he told Mr. Rensch he had seen a woman driving the Corvette at the time of the accident.  Although at first Mr. Rensch indicated he would use Eckholm as a witness, he never contacted Eckholm again.  So Eckholm called Mr. Rensch a second time.  Eckholm testified Mr. Rensch responded that Mr. Engesser was a "bad guy" anyway and "they kind of wanted to put him away."  Mr. Rensch did not call Eckholm as a witness at the trial.

At the 2007 habeas hearing, Eckholm testified he used the words "her" or "she" or "the woman" to describe to Trooper Fox on the night of the accident who the driver of the Corvette had been.  At the habeas hearing, Eckholm could not explain why he did not record in his written statement on the night of the accident his observation that a woman had been driving.  He did testify that Trooper Fox never asked him who was driving.

Eckholm testified again at another habeas hearing in 2011. Defendants assert Eckholm "changed his story" in 2011 by testifying he told the trooper on the night of the accident explicitly that a woman was driving.  Mr. Engesser asserts Eckholm did not change his testimony— upon questioning in 2011, Eckholm clarified, "All I was saying is I was talking about a woman driving the whole time after the accident."

Delaney Fowler testified at the 2007 habeas hearing too.  She testified that, although she did not see who was driving at the time of the accident, she *had* seen a woman with puffy blonde shoulder-length hair driving the Corvette a couple different times earlier in the day.[11]  Delaney Fowler testified that she gave this information to Trooper Fox on the night of the accident.  Delaney Fowler testified in 2007 that Trooper Fox never asked her on the night of the accident who was driving.

---

[11] A pastime enjoyed by Rally attendees is driving around in loops through the Sturgis area taking in the vehicles and persons on view.

In 2007, Delaney Fowler denied that Trooper Fox had ever contacted her after the night of the accident.  She testified again in 2011 and, at that time, agreed that Trooper Fox had contacted her by phone approximately one month after the accident, but she could not recall any specifics about that telephone conversation.

Phyllis Gillies testified at the 2011 habeas hearing.  In 2000 she had been a friend of Dorothy's for 8 years.  She testified Dorothy loved her Corvette and liked to speed.  Mr. Rensch testified at one of Mr. Engesser's habeas hearings that he was aware of witnesses he could have called to establish Dorothy's driving habits.  Mr. Rensch testified Mr. Engesser would not allow him to call any witnesses which would have denigrated Dorothy.

Greg Smeenk testified at the 2011 habeas hearing.  He testified he arrived right after the accident, opened the driver's side door, and then left the scene of the accident just as emergency personnel were arriving. Smeenk testified he left because he felt there was nothing more that he could do to render assistance and he wanted to get his children, who were present, away from the scene of the accident.  Smeenk first came forward in 2007 after seeing an article about the case.  In 2007, he contacted the Butte County Sheriff's office and told them he had been at the scene of the accident.  Thereafter, he spoke to the state's attorney

and told the attorney what he knew.  Neither Trooper Fox nor Mr. Kayras were aware of Smeenk's actions prior to him coming forward in 2007.[12]

Sean Boyle testified at the 2011 habeas hearing.  He testified he saw Dorothy get behind the wheel of the Corvette on the driver's side of the car when she and Mr. Engesser left the Full Throttle Saloon on the evening of the accident.  Boyle admitted not coming forward at the time of the accident because he knew there was an arrest warrant out for him for a fourth DUI.  Boyle testified he absconded to Florida to avoid arrest, returning to South Dakota in 2007.

Phillip Syverson testified at the 2011 habeas hearing.  Syverson testified he saw the Corvette as it was merging onto the interstate on the day of the accident and that the driver had feminine features and "definitely feminine hair."  Syverson came to light as a witness because he worked with Mr. Engesser's cousin, Rusty Engesser, and a conversation about the accident arose at work following Mr. Engesser's conviction.  Neither Trooper Fox nor Mr. Kayras knew Syverson had relevant information prior to his testimony in 2011.

Ramona Dasalla testified at the 2013 habeas hearing.  She testified she was "absolutely sure" a woman was driving the Corvette immediately prior to the accident.  Dasalla learned about Mr. Engesser's habeas case in 2013 when reading the Rapid City Journal newspaper and seeing an

---

[12] Greg Smeenk was one of the two witnesses the state disclosed to Mr. Engesser *after* the state circuit court had held its evidentiary hearing on Mr. Engesser's 2006 (second) state habeas petition.

22

article about that topic.  She realized she had seen the Corvette just before the accident and that a woman had been driving.  Dasalla contacted the journalist who wrote the article and, in turn, came into contact with Mr. Engesser's habeas counsel.  Neither Trooper Fox nor Mr. Kayras knew Dasalla had relevant information prior to her testimony in 2013.

Trooper Fox now moves for summary judgment in his favor, arguing he is entitled to qualified immunity because Mr. Engesser cannot make out a constitutional violation.  See Docket No. 73.  Mr. Kayras also moves separately for summary judgment on his own behalf urging much the same arguments.  See Docket No. 57.  Finally, the Meade County defendants move for summary judgment on their behalves, arguing Mr. Engesser cannot make out a claim under Monell or under a conspiracy theory.  See Docket No. 77.  Mr. Engesser resists each of these motions in part.  See Docket No. 89.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.  See Matsushita Elec. Co. v.

23

Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

24

supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

**B.     The Law of Qualified Immunity**

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Engesser must show (1) defendants acted under color of state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is immunity from suit, not just a defense to liability at trial.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  Therefore, the Supreme Court has "repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 536 (1991).

25

To determine whether an official may partake of qualified immunity, two factors must be determined:  (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity if the answer to either of the <u>Saucier</u> prongs is "no."

The question of whether a constitutional right was clearly established may not be formulated at a "high level of generality." <u>Mullenix v. Luna</u>, 577 U.S. ___, 136 S. Ct. 305, 308 (2015).  Rather, the Court requires that the inquiry be based on the specific context of the case, not a broad general proposition.  <u>Id.</u>  The Court has made clear there must be a case nearly factually squarely on point decided by the Supreme Court before a constitutional right can be considered "clearly established."  <u>Id.</u> at 308-09.  For example, whether a plaintiff's right to be free from excessive force was clearly established under the law is not the appropriate inquiry.  <u>Id.</u>  Instead, the court must ask whether the right to be free from lethal force was clearly established in the context of a fleeing disturbed felon in the immediate area of persons to whom a risk of harm is posed by the felon's flight.  <u>Id.</u> at 309 (discussing <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985)).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Stanton v. Sims, 571 U.S. 3, 5-6 (2013) (cleaned up). "'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" Stanton, 571 U.S. at 5. "'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting Hunter, 502 U.S. at 229).

The Supreme Court has stated that "if the defendant does plead the [qualified] immunity defense, the district court should resolve that threshold question before permitting discovery." Crawford-El v. Britton, 523 U.S. 574, 598 (1998) (citing Harlow, 457 U.S. at 818). The Court held that a "firm application of the Federal Rules of Civil Procedure is fully warranted and may lead to the prompt disposition of insubstantial claims." Id. at 597 (cleaned up).

Only if the plaintiff's claims survive a dispositive motion on the issue of qualified immunity will the plaintiff "be entitled to some discovery." Crawford-El, 523 U.S. at 598. Even then, the Court has pointed out that Fed. R. Civ. P. 26 "vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." Id. Such discretion includes the ability to establish limits on the number of depositions and interrogatories, to limit the length of depositions, to limit the number of requests to admit, to bar

27

discovery on certain subjects, and to limit the time, place, and manner of discovery as well as its timing and sequence.  Id.

The party asserting qualified immunity has the burden to establish all the predicate facts supporting a grant of immunity.  Winslow v. Smith, 696 F.3d 716, 730 (8th Cir. 2012).  When immunity is asserted in a summary judgment motion, all reasonable inferences from the facts are given in benefit of the nonmoving party.  Id.

The qualified immunity defense applies only to the individual capacity claims against defendants for money damages; it does not affect plaintiff's official capacity claims for declaratory and injunctive relief.  Pearson, 555 U.S. at 242-43 (2009); Hafer v. Melo, 502 U.S. 21, 25 (1991); Grantham v. Trickey, 21 F.3d 289, 295 (8th Cir. 1994).  Therefore, only defendants Trooper Fox and Mr. Kayras can partake of qualified immunity.  The Meade County defendants are sued in their official capacities only, so qualified immunity is inapplicable to those claims against those defendants.

## C.    Whether Mr. Engesser Has Shown Disputes of Material Fact Exist as to Whether a Constitutional Right has been Violated?

Mr. Engesser asserts substantive due process claims against Trooper Fox and Mr. Kayras for reckless investigation and manufactured evidence.  He also asserts claims against the same two defendants under Brady for destroying the sun visor from the Corvette and for destroying the video of the crash scene.  He asserts a claim against Mr. Kayras for failure to supervise and train Trooper Fox.

28

### 1.    Potential Constitutional Violations Arising from the Investigation

The Due Process clause of the Fifth and Fourteenth Amendments provide that "[n]o State . . . shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1,  A plaintiff asserting a violation of his substantive due process rights must show "(1) that the official violated one or more fundamental constitutional rights, and (2) that the conduct of the . . . official was shocking to the 'contemporary conscience.' " Winslow, 696 F.3d at 731 (quoting Flowers v. City of Minneapolis, 478 F.3d 869, 873 (8th Cir. 2007)).

### a.    Violation of a Fundamental Constitutional Right

To show that a criminal investigation violated due process, Mr. Engesser "must show that the defendant officer's 'failure to investigate was intentional or reckless, thereby shocking the conscience.' " Id. at 732 (quoting Cooper v. Martin, 634 F.3d 477, 481 (8th Cir. 2011)).  The court has found the following sufficient to establish a conscience-shocking reckless or intentional failure to investigate:  "(1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, [or] (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence."  Id. (quoting Akins v. Epperly, 588 F.3d 1178, 1184 (8th Cir. 2009)).

Mere negligence such as failing to follow up on evidentiary leads is not a violation of due process.  Id. (citing Amrine v. Brooks, 522 F.3d 823, 833-34 (8th Cir. 2008); Wilson v. Lawrence Co.Wilson v. Lawrence Co., 260 F.3d 946,

955 (8th Cir. 2001)).  Instead, recklessness requires showing "a person
disregards a risk of harm of which he is aware."  Id. at 734 (quoting Farmer v.
Brennan, 511 U.S. 825, 836-37 (1994)).

A claim that a defendant manufactured false evidence "requires proof
that investigators deliberately fabricated evidence in order to frame a
defendant."  Id. (citing Whitlock v. Brueggemann, 682 F.3d 567, 585 (7th Cir.
2012); and Devereaux v. Abbey, 263 F.3d 1070, 1076-77 (9th Cir. 2001) (en
banc)).

There are several aspects of the investigation Mr. Engesser alleges
constituted a reckless or intentional mis-investigation by Trooper Fox and
Mr. Kayras:  (1) ignoring Eckholm and Delaney Fowler's statements at the time
of the accident that a woman had been driving; (2) assuming that the impact of
the crash sprung the driver's side door open and that this was how
Mr. Engesser was expelled from the Corvette, instead of asking witnesses
whether someone had opened the door post-accident; (3) allowing Becky Feist,
a person with a financial interest in having Mr. Engesser found to be the driver,
tamper with evidence in the Corvette; (4) destroying, discarding, or failing to
preserve the sun visor from the Corvette; (5) destroying, discarding, or failing to
preserve the video of the accident scene; (6) presenting false testimony to the
grand jury and at trial.

### i.    ignoring contemporaneous evidence of Dorothy driving

Trooper Fox's case against Mr. Engesser was built initially on three facts
he took to be true:  (1) no one could identify who was driving at the time of the

accident; (2) the driver's side door popped open on impact as a result of the collision; and (3) Mr. Engesser was found proximate to the open driver's side door of the Corvette, leading Trooper Fox to theorize his body had passed out of the Corvette through that door.  In fact, in their summary judgment motions, defendants assert much of the evidence at trial revolved around the open driver's side door and the implications to be taken from that fact.  <u>See</u> Docket No. 99 at p. 15, ¶ 78.  From this initial premise, Trooper Fox sought to bolster his initial conclusions by finding out where on her body Dorothy sustained injuries and where on his body Mr. Engesser sustained injuries.  Mr. Engesser has shown with evidence acceptable under Rule 56(c) that two of these three suppositions were wrong and should have been known by Trooper Fox to be wrong at the time he was investigating.

Eric Eckholm and Charlotte Delaney Fowler both testified under oath that at the scene of the accident they each told Trooper Fox they had seen a woman driving the Corvette.  Eckholm stated he made it clear he had seen a woman driving immediately prior to the accident by using the words "she," "her," and "the woman" to describe the driver when he spoke to Trooper Fox that night.

Delaney Fowler did not see who was driving the Corvette at the time of the accident, but she testified under oath that she told Trooper Fox she had seen the Corvette a couple of times earlier in the day and that a woman had been driving the car on those earlier occasions.

31

In addition, there was a letter from Mr. Engesser's civil attorney stating he had personally spoken to Sean Boyle and that Mr. Boyle said Dorothy was driving the Corvette when she and Mr. Engesser left the Full Throttle Saloon within an hour or two before the accident.

Trooper Fox testified otherwise. He asserts no witness could identify who had been driving immediately prior to the accident. This is a material fact. There is clearly a dispute about it. Mr. Engesser has supported his dispute of Trooper Fox's assertion of fact with sworn testimony. Nor is this testimony like so many of the witnesses that did not come forward with their knowledge and information until habeas hearings in 2007, 2011, or 2013. This is sworn testimony by Eckholm and Delaney Fowler that they gave their information to Trooper Fox *on the night of the accident.*

Defendants argue before this court that Eric Eckholm and Charlotte Delaney Fowler changed their testimony between the time of the accident and the time of their appearances at Mr. Engesser's habeas hearings. First, the court notes defendants do not support this assertion with any affidavit, deposition testimony or other document, so the fact is not properly established under Rule 56. The only "evidence" offered is that Eckholm's written statement does not identify a woman as a driver. But Mr. Eckholm explained in his testimony that Trooper Fox never asked him on the night of the accident who was driving. Having not been asked for this information, it is plausible that in summarizing his oral statement in writing, Eckholm may not have thought the information was wanted, needed, or significant to Trooper Fox.

32

Neither Eckholm nor Delaney Fowler were called as witnesses at
Mr. Engesser's trial, so we have no prior trial testimony with which to compare
their sworn habeas testimony. Their later sworn testimony, Eric Eckholm's in
particular, was adamant that they have told the same story all along—that a
woman was driving the Corvette at the time of the accident. Circumstantial
evidence supports their sworn testimony in that Eckholm contacted
Mr. Rensch around the time of Mr. Engesser's criminal trial and told him the
same thing—that he saw a woman driving.

In addition to the statements of Eckholm and Delaney Fowler, the
information about Sean Boyle's testimony was made known to Trooper Fox and
Mr. Kayras four full months before the state sought an indictment against
Mr. Engesser. Although Trooper Fox testified Boyle could not be located,
Trooper Fox's investigative file documents no such efforts to locate Boyle. See
Docket No. 109 at p. 48 (pp. 189-92 of Fox depo.) For purposes of analyzing
defendants' summary judgment motions, Mr. Engesser's version of the facts
will be taken as true. Trooper Fox's assertion that no one could tell him who
was driving immediately prior to the accident is a disputed material fact.

### ii. the open driver's side door

Second, much emphasis was laid by Trooper Fox on the open driver's
side door. He believed that the driver's door was the only avenue through
which Mr. Engesser's body could have been thrown from the Corvette, a theory
he urged at all stages of Mr. Engesser's investigation, prosecution, and
conviction. The open door, plus Mr. Engesser's proximity in the median to that

33

open door, lead Trooper Fox to believe Mr. Engesser had been in the driver's seat (and therefore driving) immediately prior to the accident. This was a false supposition.

Mr. Engesser points out that Greg Smeenk actually arrived on scene and opened the door, which is true and supported by sworn testimony. Mr. Engesser faults Trooper Fox's investigation because he never asked anyone whether they opened the door or saw someone else open the door.

The court notes Greg Smeenk's actions only became known years later in 2007 during habeas proceedings. Although Mr. Engesser tries to assert that Mary Redfield saw Smeenk open the door, he has produced neither affidavit nor sworn testimony nor document that shows Ms. Redfield knew of Smeenk's actions. Her testimony before the grand jury was that she saw the door in its open state. She never testified she saw Smeenk or anyone else open the door. She was in a position where she could have, if she had focused her attention on it, seen Smeenk open the door. But showing she was in a position to observe is not the same thing as showing she actually observed. Her attention was focused on Mr. Engesser, whose face was purple and who was not breathing. There is good reason why she apparently did not notice Smeenk opening the door.

Mr. Engesser also points to sworn testimony from Smeenk—again, years later after the accident—that some third person yelled at him to get away from the Corvette because it might blow up. Mr. Engesser has not produced an affidavit, sworn testimony, or document from this third person to prove this.

34

More to the point, Mr. Engesser has produced no evidence Trooper Fox knew about this third person and his or her comments. The only proof of this third person is Smeenk's own testimony which, again, did not come to light for many years.

There is some suggestion that Trooper Fox talked to the paramedic, Aaron Zimmiond, about how the door got open. See Docket No. 109 at pp. 21-22. However, that oblique reference does not specifically or affirmatively set forth what Zimmiond told Trooper Fox. Id. Aaron Zimmiond's written statement created shortly after the accident is on file with the court, but he does not set forth in that statement any information about the driver's door. See Docket No. 76-9.

What the court finds persuasive on the issue of the open door, no party has discussed in their brief and it is this: the law enforcement officers were the last persons to arrive at the accident scene. Civilian responders like Greg Smeenk and Mary Redfield were there first. Professional emergency responders like Aaron Zimmiond were next to arrive. Significantly, *the paramedics removed Dorothy's body from the Corvette and laid it in the grass*. This action was accomplished before Trooper Fox arrived on scene. Trooper Fox was aware that paramedics had removed Dorothy from the Corvette because he saw her body lying in the grass and he spoke to paramedics asking them in what position they had found Dorothy's body inside the Corvette. See Docket No. 76-1 at p. 4, ¶¶ 32-34.

35

*It should have been obvious to Trooper Fox that the paramedics would have removed Dorothy's body through the driver's side door since the passenger side of the car was crushed.*  And yet, neither Trooper Fox nor any other defendant has adduced proof that he *asked* paramedics whether they were the ones to open the driver's side door.  Plaintiff has adduced proof of the contrary: Trooper Fox never asked any witness how the door came to be open.  Docket No. 109 at p. 21 (pp. 79-81 of Fox's deposition); and p. 50 (p. 200 of Fox's deposition).  Instead, he assumed—erroneously—that the door had popped open through the impact of the collision and allowed Mr. Engesser's body to pass through it.

Aaron Zimmiond never said in his written statement whether the door was open when he arrived on scene or not, a fact Trooper Fox noted in his deposition.  <u>See</u> Docket No. 109 at p. 45 (p. 178 of Fox deposition).  <u>See also</u> Docket No. 76-9 (written statement of Aaron Zimmiond).  Trooper Fox could not say with any certainty whether he had ever asked Zimmiond about the driver's door or not.  Docket No. 109 at p. 45.  He could not recall with any certainty whether he asked *anyone* how the door came to be open.  <u>Id.</u> at p. 50 (p. 200 of Fox depo.).

The Greg Smeenk fact is a "pink elephant" fact.  No law enforcement officer could reasonably be expected to anticipate that a civilian would rush in after an accident, open the driver's door, and then leave the scene without telling anyone what he had done (until many years later).  But the paramedics' actions at the scene were clearly *known* to Trooper Fox *at the time* and the

36

implications of Dorothy's body lying in the grass—i.e. that she had been removed from the car through the driver's side door--should have been apparent to Trooper Fox. He *should have asked* if the paramedics were responsible for the driver's door being open rather than assuming it opened as a result of the force of the collision. He did not do so.

Of course we know, now, as a factual matter is that Zimmiond would have found the Corvette's driver's side door open when he arrived there because we now know Smeenk opened it before Zimmiond's arrival. But the question raised by Mr. Engesser's reckless investigation claim is *not* what Smeenk did or what Zimmiond saw, but rather whether Trooper Fox's actions were reckless or intentionally malign when he assumed the accident popped the driver's side door open without actually asking someone how it came to be open. Given the facts known to Trooper Fox, this was reckless. He knowingly ignored a known risk—i.e. that his assumption might be wrong and might implicate an innocent person. Furthermore, although the open driver's door was not the only building block of Fox's theory of the events, it was the foundation upon which all else was built. This fact weighs heavily in favor of Mr. Engesser's claim.

### iii.    allowing Becky Feist to tamper with evidence

Mr. Engesser also points to the fact that Becky Feist was allowed to enter the Corvette the day after the accident and retrieve her mother's purse. See Docket No. 60-1 at pp. 28-29 (pp. 647-48 of the jury trial transcript). Trooper Fox and Mr. Kayras assert they had no prior knowledge that Becky Feist was

37

going to ask to access the car and no knowledge that she had a financial
interest in whether Mr. Engesser was found to be the driver of the car.  They
assert they never gave permission to the proprietor of the impound lot or to
Ms. Feist to access the Corvette.

Defendants' statements of fact are not contradicted by Mr. Engesser.
However, the court notes there is also no assertion by defendants that they
instructed the proprietor of the impound lot that it was, in essence, a
custodian of evidence in a criminal case and that *no one* should be allowed to
access the Corvette.  In fact, Trooper Fox's testimony at his deposition
establishes he believed the proprietor of the impound lot had the discretion to
allow "loved ones" to access evidence to retrieve belongings from their dearly
departed.  See Docket No. 109 at p. 53 (p. 211 of Fox Depo—"Generally
speaking, the tow yards are the ones who make the decision if anybody is
allowed to go into a wrecked vehicle to look for loved one's belongings or
whatever they might do.").

The lack of proper instruction by either Fox or Kayras to the proprietor of
the impound lot, together with the altogether lackadaisical attitude conveyed
by the storage of the Corvette outside, untarped and exposed to the elements,
is indeed reckless on the part of these law enforcement officers.  They turned a
blind eye to a known risk—i.e. that evidence would be lost or contaminated by
loss of proof of chain of custody.  Given the police's own rather cavalier
treatment of the Corvette, the impound lot could be excused for not realizing

the fact that they were now the bailee of an important piece of criminal evidence.

If police were asking a private third party to store a large amount of cocaine for them, surely they would have taken some steps to ensure the evidence was not tampered with.  At the very least, one could reasonably expect law enforcement to have meticulously documented the interior of the Corvette by photograph so that law enforcement had independent proof and verifiable chain-of-custody regarding where Dorothy's purse was in the Corvette prior to Ms. Feist removing it.  Apparently this was not done.  No party addresses the fact.  The court finds this fact and the implications therefrom weigh in favor of Mr. Engesser.

### iv.    failing to preserve the sun visor

Mr. Kayras asserted as fact that no one at the South Dakota Highway Patrol intentionally destroyed the visor during the pendency of the trial.  <u>See</u> Docket No. 99 at p. 13, ¶ 61.  Mr. Engesser admits this fact without qualification.  Docket No. 86 at p. 14, ¶ 61.  Trooper Fox asserted as fact that he never had possession of the visor at any time.  <u>See</u> Docket No. 75 at p. 15, ¶ 172.  Mr. Engesser admitted this fact without qualification.  <u>See</u> Docket No. 87 at p. 29, ¶ 172.  It is Mr. Engesser's burden to show Trooper Fox and Mr. Kayras acted recklessly or intentionally with regard to this issue.  He has failed to carry this burden.  This fact weighs in favor of defendants in determining if their investigation was reckless or intentionally misguided.

### v.    failing to preserve the accident scene video

This issue is discussed in greater detail below in the <u>Brady</u> section of this opinion.  Mr. Engesser has failed to show that any such video ever existed, let alone that defendants intentionally or recklessly destroyed the video.  This fact weighs in favor of defendants.

### vi.    false testimony

Mr. Engesser asserts Trooper Fox provided false testimony before the grand jury which indicted him and at his jury trial.  Specifically, he asserts Trooper Fox testified to the grand jury that Mr. Engesser told him, "Yeah. I drove."  Not only did Mr. Engesser never state these words to Trooper Fox, but when, taken in context, Mr. Engesser asserts he actually clearly denied being the driver.  Mr. Engesser asserts Trooper Fox lied when he testified no witnesses were able to say who was driving the Corvette.  Mr. Engesser alleges Trooper Fox lied when he testified that the driver's door was the only way Mr. Engesser's body could have exited the Corvette.  And Mr. Engesser asserts Trooper Fox lied when he testified Mr. Engesser had injuries only to the left side of his body.  The court understands these allegations of false testimony to comprise the entirety of Mr. Engesser's claim that Trooper Fox and Mr. Kayras "manufactured" evidence.

Trooper Fox responds that he is entitled to absolute immunity for his testimony both before the grand jury and at trial.  Trooper Fox is correct.

In <u>Briscoe v. LaHue</u>, 460 U.S. 325, 335-46 (1983), the Court acknowledged the common law absolute immunity witnesses testifying in court

would have against subsequent actions for money damages, and refused to carve out any exception for lying police officers under § 1983.  See also Holmes v. Slay, 895 F.3d 993, 999 n.7 (8th Cir. 2018) (noting the correctness of the district court's holding that police officers were entitled to absolute immunity for their testimony at a criminal trial, so the truthfulness or untruthfulness of that testimony was not at issue).  In Rehberg v. Paulk, 566 U.S. 356, 374-75 (2012), the Court extended the § 1983 immunity for trial testimony to include grand jury testimony.  See also Meidinger v. Ragnone, 661 Fed. Appx. 449, 452 (8th Cir. 2016) (same).

Mr. Engesser responds to Trooper Fox's absolute immunity claim by arguing that absolute immunity does not extend to claims of reckless investigation and manufactured evidence.  He is right.  The court has analyzed those claims separately.  But Trooper Fox's testimony is a separate matter.

The court finds that Trooper Fox is entitled to absolute immunity for his testimony before the grand jury and at Mr. Engesser's trial.  Accordingly, the truthfulness or untruthfulness of that testimony is not in issue.  Holmes, 895 F.3d at 999 n.7.  The court will not consider the facts alleged by Mr. Engesser about Trooper Fox's testimony in determining whether defendants' investigation was reckless or intentionally malign.

In summary then, the court finds Mr. Engesser has shown a reckless investigation that violates his due process rights by demonstrating there is a genuine dispute of fact as to whether any witness told Trooper Fox on the day of the accident that a woman had been driving the Corvette, in failing to ask

41

anyone including paramedics if they had opened the door, and in allowing Becky Feist to access the evidence within the Corvette without law enforcement oversight or documentation of the foray into the vehicle.

### b.    Shock the Conscience

In addition to proving a reckless investigation that violated due process interests, Mr. Engesser must also prove the second element—that the constitutional violation was so shocking as to "shock the conscience." Id. at 735.  "Only in the rare situation when the state action is 'truly egregious and extraordinary' will a substantive due process claim arise." Id. (quoting Strutton v. Meade, 668 F.3d 549, 557 (8th Cir. 2012)).  "Substantive due process 'is concerned with violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to brutal and inhumane abuse of official power. . .'" Id. (quoting Golden ex rel. Balch v. Anders, 324 F.3d 650, 652-53 (8th Cir. 2003)).

In Winslow, the Eighth Circuit held plaintiffs had adduced sufficient evidence to survive a qualified immunity summary judgment motion where they showed the investigators ignored a glaring discrepancy between their theory of the case and the evidence—namely that none of the four suspects matched the type-B blood found at the crime scene—and nevertheless "pressed ahead" and exerted pressure on "vulnerable witnesses to provide testimony that was not within those witnesses' personal memory." Id. at 735.  The police coerced witnesses into giving statements that supported the police theory of the

crime by lying about the results of blood tests, suggesting facts, providing psychotherapy to help witnesses recover sublimated memories, and lying about the results of lie-detector tests.  Id. at 721-30.

Although the court acknowledged police cannot be held liable for "aggressively investigating the crime, believing witnesses, following leads, and discounting . . . evidence that [does] not fit with the evidence at the scene of a crime," and that "every witness's account will [not likely] align perfectly with the testimony of every other witness," the evidence in this case went beyond mere aggressive investigation.  Id. at 735.  Noting that defendants not only coerced the defendants' confessions, but "purposefully ignored the fact that no witness could independently provide testimony about the details of the crime; and exerted undue pressure to implicate Plaintiffs or to improperly strengthen the state's case against Plaintiffs," the court also found the constitutional deprivations "shocked the conscience."  Id.

By contrast, the court found the police officer's investigation to be merely negligent in Cooper v. Martin, 634 F.3d 477, 481 (8th Cir. 2011), where the officer received hearsay statements that the suspect was not involved in an assault and wanted to meet with the officer to give a statement, but the officer instead credited the affidavit of the inebriated victim that the suspect was involved in the assault and never interviewed the suspect.

The court notes two things before embarking on its analysis.  First, Mr. Engesser has adduced no direct proof that Trooper Fox or Mr. Kayras acted

43

intentionally to frame him, despite the statement Mr. Eckholm attributes to Mr. Rensch that this was a "bad guy" that "they" just wanted to "put away."

In addition, Trooper Fox rather incredibly rejects the findings of three separate habeas courts and the sworn testimony of six eye witnesses. See Docket No. 109 at pp 18-19 (depo. pp. 72-74); p. 19 (depo p. 75); p. 45 (depo. pp. 177-78); p. 47 (depo. pp. 185-86); and p. 72 (depo. p. 282). He affirmatively testified in January, 2018, that he still believes Mr. Engesser was the driver of the Corvette and was rightfully convicted. Id. at p. 71 (depo. p. 282). Viewing the facts most favorably to Mr. Engesser, a jury could find this suggests personal animus on Trooper Fox's part and is some circumstantial evidence that his actions may have been intentional. It may also simply suggest pride and an unwillingness to admit a mistake. Significantly, no question was posed to Trooper Fox in his deposition whether he knew Mr. Engesser prior to the crash or knew of him by reputation. The evidence of an intentional investigation designed to frame Mr. Engesser is very weak. The evidence of recklessness is stronger.

The second thing of note is that the "shock the conscience" standard is somewhat subjective. A lay person unfamiliar with the criminal justice system may have a very different "conscience" or shock-threshold than a grizzled criminal defense lawyer, veteran prosecutor, or judge who hears criminal cases day in and day out. Although summary judgment and qualified immunity are matters for the court, summary judgment by its very nature asks the question

44

whether a reasonable *jury* could find for the plaintiff on the undisputed material facts.

The undisputed material facts as to recklessness are that Trooper Fox asked no one how the Corvette's driver's door came to be open, despite glaring evidence that he should have realized the paramedics, at the very least, had opened the door. He then used his supposition that the door popped open in the accident to build a case against Oakley Engesser. Further undisputed is that neither Trooper Fox nor Mr. Kayras informed the impound lot that no one should be allowed to tamper with the Corvette or its contents. In addition, Trooper Fox testified he felt the impound lot could use its discretion in allowing access.

It *is* a disputed issue of fact whether Eric Eckholm and Charlotte Delaney Fowler told Trooper Fox *on the night of the accident* that they saw a woman driving the Corvette. Mr. Engesser has supported his assertion of fact with proper evidence. This fact, then, and the inference from it, are taken in Mr. Engesser's favor. The court finds a reasonable jury, faced with a law enforcement officer who fails to document eye witness testimony of *the key fact* in a vehicular homicide investigation—a fact attested to by two eye witnesses, not one—could indeed have their consciences shocked. Although Trooper Fox denies that Eckholm and Delaney Fowler ever told him a woman was driving, he agreed that intentionally disregarding such witness statements would be reckless. See Docket No. 109 at p. 25 (Fox depo. pp. 98-99).

This is not a case where Trooper Fox heard and noted in his report the fact that two witnesses reported a woman driving and then discounted those reports because it did not fit with other, more persuasive evidence. An investigator is allowed to weigh competing evidence and decide that some evidence is more persuasive than others. That is not what Trooper Fox did in this case. Giving the plaintiff the benefit of disputed facts and inferences from those facts, Trooper Fox chose to disregard the oral statements of two separate witnesses and he failed or refused to document those statements.

Three facts taken together, the disregard of Eckholm and Delaney Fowler's statements, the failure to prevent third parties from accessing the key piece of evidence, and the erroneous assumption about the open driver's door despite obvious facts which contravened that assumption, shock the conscience of this court. Further, the court finds that the collective conscience of a reasonable jury could be shocked by these facts. The Eighth Circuit has found that both purposefully ignoring exculpatory evidence as well as systematic pressure to implicate the defendant in the face of contrary evidence shocks the conscience. Dean v. Searcey, 893 F.3d 504, 514 (8th Cir. 2017); Akins, 588 F.3d at 1184. The court finds the evidence regarding Trooper Fox falls into both these categories.

As an aside, the court notes the fact that this accident took place during the motorcycle rally was both a gold mine and an obstacle to law enforcement. There were so many people and vehicles stopped on I-90 because of the crash that it created a further safety and traffic hazard. But it also presented a

46

potential bonanza of information for law enforcement, if they had chosen to mine it.  Even if just the name and phone number of all departing potential witnesses had been maintained, or if the officers had merely photographed the license plates of each departing vehicle, there would have been a mechanism to find out about Greg Smeenk, Phillip Syverson, Ramona Dasalla, and Phyllis Gillies.  Other avenues short of getting names or license plates could have been used, too.  A tip line could have been set up with public requests for witnesses to come forward and broadcast over radio, television and newspaper.

But the court's conclusion is not based on Trooper Fox and Mr. Kayras failing to take any of these steps.  It is based on the three material facts established by Mr. Engesser:  ignoring two eye witnesses' contemporaneous statements that a woman was driving, allowing Becky Feist to tamper with evidence, and making a completely unwarranted assumption about the open driver's side door.

### c.    Qualified Immunity

The final hurdle Mr. Engesser must clear in answering Trooper Fox's summary judgment motion is whether his constitutional right was clearly established in 2000 when Trooper Fox was conducting his investigation.  Mr. Engesser has not cited to a case that is factually identical to his situation, but "the absence of a factually similar case does not guarantee government officials the shield of qualified immunity."  Stanton, 571 U.S. at 5; White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008).  Instead, the "key inquiry in deciding whether a right is clearly established is whether it would be clear to a

47

reasonable officer that his conduct was unlawful in the situation he confronted." White, 519 F.3d at 814 (quoting Moran v. Clark, 359 F.3d 1058, 1060-61 (8th Cir. 2004)).

In the White case, the court found the defendant police detective was not entitled to qualified immunity despite the lack of a factually-identical case. Id. The detective misrepresented that he was having a sexual affair with the complaining witness and failed to preserve a diary of the victim. Id. The court held a reasonable police officer in the detective's shoes should have known he was violating the plaintiff's constitutional rights. Id.

So, too, here. Many aspects of Trooper Fox's investigation may be viewed as merely negligent. But not his complete disregard of Eckholm and Delaney Fowler's oral statements and his failure to document those oral statements going forward. A reasonable police officer in Trooper Fox's shoes would have known that disregarding and failing to acknowledge and/or document key exculpatory eyewitness accounts would violate Mr. Engesser's constitutional rights. The court recommends denying Trooper Fox's motion for summary judgment on the reckless investigation substantive due process claim.

Mr. Engesser asserts no direct involvement in the reckless investigation by Mr. Kayras. He argues that Mr. Kayras is liable for assigning Trooper Fox to investigate in the first place, and then for failing to exercise proper oversight once the investigation was underway. These allegations fall under the umbrella of supervisory liability, discussed in more detail below. The court recommends granting Mr. Kayras's motion for summary judgment on

48

Mr. Engesser's substantive due process claims against him for reckless investigation and manufactured evidence.

### 2.    Alleged **Brady** Violations

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963).  Not only does Brady apply to prosecutors, it also extends "to actions of other law enforcement officers such as investigating officers."  However, when a Brady claim is asserted against an investigating law enforcement officer, the plaintiff must show the officer acted in bad faith in failing to preserve, or in failing to disclose, evidence potentially useful to the accused.  White, 519 F.3d at 814 (quoting Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir. 2004)).  In a § 1983 action, the plaintiff asserting a Brady claim against a law enforcement officer must show the officer "intended to deprive the defendant of a fair trial."  Id.

Here, the district court has already concluded that Mr. Engesser cannot assert a claim for the destruction of potential evidence in and on the Corvette as a result of leaving the Corvette outside, untarped and exposed to the elements and he cannot assert a Brady claim against the Meade County defendants.[13]  See Docket No. 38 at pp. 24-25.  His only remaining Brady

---

[13] That is because, as to the police officers, the South Dakota Supreme Court had already decided in Mr. Engesser's direct appeal that the officers did not act in bad faith in failing to preserve the biological evidence in the Corvette and because Mr. Engesser did not demonstrate he was prejudiced by their failure to preserve that potential evidence.  See Docket No. 38 at pp. 24-25 (citing State

claims are, therefore, against Trooper Fox and Mr. Kayras for the

loss/destruction of the sun visor and the "destruction" of the video of the

accident scene.

### a.    The sun visor

At the beginning of the criminal case, Mr. Engesser's counsel,

Mr. Rensch, sent an omnibus discovery request letter.  He followed that up

with a letter dated August 16, 2001, specifically requesting the results of any

DNA, blood, or bodily substance tests from the Corvette.  See Docket No. 63-3.

Defendant then-Meade County State's Attorney Mr. Swanson responded

on August 16, 2001, that his office had already turned over the results of all

testing that had been done and he did not plan to conduct any further testing

as he did not believe it would be of any use to either party.  See Docket No. 63-

4.  A May 22, 2001, letter from Mr. Swanson to Mr. Rensch confirmed that

Mr. Rensch was given Mr. Riis' lab report on the hair found on the visor.  See

Docket No. 64-2.

Prior to trial in the criminal case, Mr. Rensch made a motion to dismiss

based on spoliation of the evidence.  An evidentiary hearing was held August 3,

2001, on this motion.  See Docket No. 76-18.  Rex Riis testified about his

observations from examining the Corvette and his taking of the sun visor back

to his laboratory in Pierre.  Id. at pp. 1-12.  In addition to the fact that the gray

hair found on the visor lacked a follicle, Riis testified he performed no tests on

---

v. Engesser, 661 N.W.2d 739, 755-56 (S.D. 2003)).  As to the prosecutors, the
district court noted that prosecutors are absolutely immune for Brady
decisions made during the course and scope of their employment.  Id.

the hair because it was impossible to determine when the hair had been deposited on the visor.  Id. at pp. 9-10.  See also Docket No. 76-20 (Riis lab report).

After hearing argument from Mr. Rensch at the conclusion of the hearing, the state court asked Mr. Rensch whether his client had ever requested independent testing and whether that testing had been refused.  Id. at pp. 13-14.  Mr. Rensch responded, "we don't have the money to do it."  Id. at p. 14.

As noted above, defendants have asserted as a statement of undisputed material fact that no one at the Highway Patrol office intentionally destroyed or disposed of the sun visor prior to trial.  See Docket No. 99 at p. 13, ¶ 61. Mr. Engesser admits this fact without qualification. Docket No. 86 at p. 14, ¶ 61.  In view of the legal standard Mr. Engesser must meet—he must show the officer "intended to deprive the defendant of a fair trial," White, 519 F.3d at 814--Mr. Engesser's admission that defendants did not intentionally destroy or dispose of the sun visor prior to trial dispenses with his Brady claim against Trooper Fox and Mr. Kayras.

If Mr. Engesser is really claiming not the loss of the sun visor itself as a Brady violation, but the exposure to the elements that rendered it impossible to draw any significance from the presence of the hair, the South Dakota Supreme Court has already determined defendants did not act in bad faith in this regard.  That is "water under the bridge."

51

One must ask, what if defendants *had* destroyed the visor prior to trial and there *was* evidence of bad faith?  Rex Riis testified there was no trace evidence, blood, or DNA on the visor other than the partial gray hair he found there.  The hair could prove nothing about whether Dorothy was sitting in the driver's seat or the passenger seat immediately prior to the accident because, as Riis testified, he had no way of knowing *when* the hair was deposited there.  If the ride which resulted in the accident were the only time Mr. Engesser had ever ridden in Dorothy's Corvette, maybe the hair would have had greater significance.  But Mr. Engesser himself told Trooper Fox he had ridden in the Corvette earlier in the day, before the stop at the saloon, and that on at least one of those earlier occasions, Dorothy had allowed him to drive.  Therefore, on the day of the accident, there was evidence that Mr. Engesser had, at different times, occupied *both* the driver's and the passenger's seat in the Corvette.  The court concludes the sun visor is a red herring.  It's disappearance signifies nothing evidentiary.

### b.    The accident scene video

Trooper Fox and Mr. Kayras have adduced proof sufficient to support their motion for summary judgment that no video was ever created of the accident scene.  See Docket No. 70 at p. 2, ¶8; Docket No. 76-1 at p. 7, ¶¶ 73-74.  Their proof demonstrates that the only video evidence created in the entire investigation was Trooper Fox's videotaped-audio only interview with Mr. Engesser in September, 2000.  Id.

The confusion over this issue began with a March 23, 2001, letter from defendant then-Meade County State's Attorney Gordon Swanson who wrote to Mr. Rensch, stating: ". . . in response to your March 19, 2001, discovery [request] letter . . . [o]ne of the troopers took a videotape at the scene, which we'll copy if you send us a blank cassette." See Docket No. 62-6. Thereafter, defendant then-Deputy Meade County State's Attorney Amber Richey wrote a letter to Mr. Rensch dated March 29, 2001, in which she acknowledged receipt of "the blank tapes you sent for copies of the video and any audio and will get those to you next week." See Docket No. 63-1.

Ms. Richey then wrote to Mr. Rensch again on April 5, 2001, explaining she was returning his blank audiocassette because there were no audio recordings in existence. See Docket No. 63-2. She then explained she was enclosing with her letter the videotape Trooper Fox created when he interviewed Mr. Engesser on September 13, 2000. Id. These letters also demonstrate that numerous still photographs of the accident scene were taken, preserved as evidence, and turned over to Mr. Rensch in discovery.

Mr. Engesser denies defendants' assertion that no video of the accident scene exists, but does not support his denial with facts sufficient to rebut the allegation as required by Rule 56. Part (c) of Rule 56 provides as follows:

(1) **Supporting Factual Positions**. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) ***Objection That a Fact Is Not Supported by Admissible Evidence***. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

(4) ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

See FED. R. CIV. P. 56(c).

Mr. Engesser's "proof" in support of his denial of the facts asserted by Trooper Fox and Mr. Kayras consists of a showing that a video *could have* been made, and maybe even *should have* been made. Mr. Engesser points out that there were six patrol cars at the accident scene and at least the Highway Patrol vehicles (which accounted for 4 of the vehicles present) had the capability of producing videos. Furthermore, Mr. Engesser asserts it was standard operating procedure for police to create a video. This latter assertion is on shaky ground, but the court accepts it for purposes of summary judgment. Nevertheless, an assertion that Fox and Kayras could have and should have created a video of the scene is not the same as showing that they *did* create a video and subsequently destroyed it.

Furthermore, there were numerous still photos of the accident scene. Mr. Engesser fails to address these or to suggest how he was prejudiced by the

absence of a video depicting the same sights as the photos.  Recall that no law enforcement officers arrived on scene until after the accident had already happened, Dorothy had been removed from the Corvette, and Mr. Engesser had been spirited away to the hospital.  Everything that officers could view that night after their arrival could have just as easily been depicted in still photos rather than video.  And it appears such documentation was made.

Mr. Engesser has simply not carried his burden under Rule 56(c) to controvert defendants' statements that no other video existed other than the video of the interview of Mr. Engesser which was provided to Mr. Engesser's trial counsel in the criminal case prior to trial.  He has produced no proof, through affidavit, document, or other suitable means to show that a video ever did exist.  The court recommends granting summary judgment in favor of Trooper Fox and Mr. Kayras on the <u>Brady</u> claim involving the destruction of any accident-scene video.  There is no evidence such a video ever existed.

### 3.    Supervisory Claim Against Mr. Kayras

Mr. Engesser alleges Mr. Kayras is liable under § 1983 for failing to properly supervise and failing to properly train Trooper Fox.  The standard for holding a supervisor liable under § 1983 is a stringent one.

"[M]ere negligence in failing to detect and prevent a subordinate's conduct is not enough for liability under Section 1983.  'The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see.'" <u>Ripson v. Alles</u>, 21 F.3d 805, 809 (8th Cir. 1994).  "[A] supervisor may be held individually liable . . . if he directly

participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Andres v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996).  The supervisor must tacitly authorize or show deliberate indifference to the offending acts.  Id.  The plaintiff must show the supervisor had notice that the subordinate's training and supervision "were inadequate and likely to result in a constitutional violation."  Id.

First, the court notes that Mr. Engesser does not allege Mr. Kayras participated directly in the violation of his constitutional rights.  Mr. Kayras' liability, therefore, must rest on a failure to train or to supervise.

Mr. Engesser has not pointed to anything in Trooper Fox's training or supervision that was so inadequate as to make likely a constitutional violation. Mr. Engesser emphasizes that, prior to the Dorothy Finley accident, Trooper Fox had never conducted an investigation into a fatality accident where the key issue was determining who the driver was from among the occupants of the vehicle.  But that states the matter far too narrowly.

Trooper Fox had been a patrol-level law enforcement officer for 6.5 years at the time of Mr. Engesser's accident.  He had received a week's worth of training at the South Dakota law enforcement academy solely on accident scene investigations.  He had received law enforcement training in the United States Air Force.  And he had investigated between 100 and 150 accidents.  In fact, Trooper Fox's lapses in this investigation, detailed above, are all the more shocking *because* he appears to have received good training.  Additionally,

56

Trooper Fox's Highway Patrol personnel file was devoid of any indication that he lacked adequate training in general, or specifically in regard to investigating accidents.  There were no documented incidents in Trooper Fox's personnel file of him disregarding and/or failing to document an eyewitness' account of an accident.

Nor was there a lack of supervision which rises to the level of "turning a blind eye" to a constitutional violation, tacitly authorizing such a violation, or exhibiting deliberate indifference to knowledge of such a violation.  The evidence adduced by both parties shows Mr. Kayras never knew that Eric Eckholm and Charlotte Delaney Fowler told Trooper Fox they saw a woman driving the Corvette.  All the written materials put together by Trooper Fox, which is all that was reviewed by Mr. Kayras, failed to mention that a woman was driving.  Nor did those materials mention that Trooper Fox failed to instruct the impound lot to maintain the sanctity of the Corvette as evidence. Nor did those written materials inform Mr. Kayras that Trooper Fox failed to ask any witness, including paramedics, how the driver's side door came to be open.

Mr. Engesser asserts that proper supervision required Mr. Kayras to retrace each of Trooper Fox's investigative steps, re-interviewing each witness that Fox had interviewed, chasing down each lead that Fox chased down.[14]

---

[14] Mr. Kayras testified he checked Trooper Fox's reports only to see that grammar and spelling were correct and that Fox had entered the appropriate codes in the boxes.  Mr. Kayras asserts this was the full extent of his duty to supervise Trooper Fox.  The court rejects Mr. Kayras' extremely narrow view of

Mr. Engesser cites no authority for this suggestion, however, and the court finds no law that would exact such a micro-managing level of supervision over a law enforcement officer with the level experience and training that Trooper Fox possessed at the time of the accident. The court recommends granting summary judgment in favor of Mr. Kayras on all claims.

**D.     Claims Against the Meade County Defendants**

**1.     The <u>Monell</u> Claim**

Two claims against the county defendants survived the defendants' early motions to dismiss: a <u>Monell</u> claim and a conspiracy claim. A claim under <u>Monell</u> asserts that a governmental subdivision, here a county, had a policy or custom that resulted in the plaintiffs' constitutional rights being violated. <u>Los Angeles County, Cal. v. Humphries</u>, 562 U.S. 29, 30 (2010).

In responding to the Meade County defendants' motion for summary judgment, Mr. Engesser concedes he has no evidence to support a <u>Monell</u> claim. <u>See</u> Docket No. 89 at pp. 38-39. The Meade County defendants should, therefore, be granted summary judgment on the <u>Monell</u> claim.

**2.     The Conspiracy Claim**

Mr. Engesser's final claim presented by the three summary judgment motions is a claim of civil conspiracy under § 1983. In order to show Trooper Fox and the Meade County defendants entered into a conspiracy to violate his constitutional rights, Mr. Engesser must show: "(1) two or more persons; (2) an

---

his duty. He, like Mr. Engesser, cites no authority to support this supposed *de minimus* standard of oversight.

58

object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy." <u>Dean v. Cty. Of Gage, Neb.</u>, 807 F.3d 931, 939 (8th Cir. 2015).

The only constitutional violation as to which Mr. Engesser has demonstrated a genuine issue of a material fact preventing summary judgment is his reckless investigation substantive due process claim against Trooper Fox. There is absolutely no evidence presented in this record that any of the Meade County defendants knew about the three facts this court has identified as genuine issues of material fact on that claim.

Mr. Engesser asserts the Meade County defendants had Trooper Fox's initial three reports identifying Dorothy as the driver of the Corvette. He asserts the Meade County defendants should have followed up with Trooper Fox when he authored his fourth report, changing his conclusion and stating that Mr. Engesser was the driver.

The court notes Aaron Zimmiond changed his testimony on September 14, 2000, the date of Trooper Fox's last report. <u>See</u> Docket No. 76-9. Whereas previously, Zimmiond had stated he found Dorothy on the driver's side of the Corvette, on September 14, 2000, he corrected his statement and said he had been influenced by the upside-down orientation of the Corvette and that actually, he had found Dorothy on the passenger side of the car. <u>Id.</u> There was no need for the Meade County defendants to "follow up" with Trooper Fox

59

and ask why he had changed his conclusion.  Zimmiond's statement provides sufficient explanation for the change.

Furthermore, failing to "follow up" with Trooper Fox may be negligent, but it does not evince an agreement, tacit or explicit, between Fox and the Meade County defendants to violate Mr. Engesser's constitutional rights.  To survive summary judgment on his conspiracy claim, Mr. Engesser must "allege with particularity and specifically demonstrate material facts, circumstantial or otherwise, that the [defendants] formed an agreement to violate [the plaintiff's] constitutional rights."  Reasonover v. St. Louis Cty., 447 F.3d 569, 582 (8th Cir. 2006) (quoting Marti v. City of Maplewood, 57 F.3d 680, 685 (8th Cir. 1995)).

There is also absolutely no evidence that Trooper Fox and any of the Meade County defendants had a meeting of the minds or agreement, explicit or implicit, to carry out acts together that would deprive Mr. Engesser of any of his constitutional rights.  Although defendant Jennifer Utter received the information regarding Sean Boyle and passed it along to Trooper Fox, there is no evidence in the record that she encouraged or knew whether Trooper Fox indeed followed up on that lead and, if so, what results he obtained by any such efforts.  The court recommends granting in its entirety the motion for summary judgment by the Meade County defendants.

60

## CONCLUSION

Based on the foregoing law, facts and analysis, the court recommends the following dispositions of the three pending summary judgment motions:

1.      granting entirely the motion by defendant Michael Kayras [Docket No. 57];

2.      granting entirely the motion by the Meade County defendants [Docket No. 77];

3.      granting in part and denying in part the motion by defendant Trooper Edward Fox [Docket No. 73]. The court recommends GRANTING Trooper Fox summary judgment on Mr. Engesser's <u>Brady</u> claim and DENYING summary judgment on Mr. Engesser's reckless investigation substantive due process claim.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED February 1, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

61